UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PATRICIA A. BUTCHER,

                        Plaintiff,

v.                                                              Case No.  5:07-cv-351-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                        Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying her application for a period of disability, and

disability insurance benefits.[2] The Commissioner has answered (Doc. 10), and both

parties have filed briefs outlining their respective positions. (Docs. 13 & 15.) For the

reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I.  PROCEDURAL HISTORY

On July 22, 2004, Plaintiff filed applications for a period of disability, disability

insurance benefits, and supplemental security income, alleging a disability onset date of

October 14, 2001. Plaintiff's applications were denied initially and upon reconsideration.

(R. at 63-66, 75-76, 79-84.) Thereafter, Plaintiff timely pursued her administrative

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Local Rule 6.02, within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] (Doc. 1.) Plaintiff originally submitted applications for a period of disability, disability insurance benefits and supplemental security income, all of which were denied initially and on reconsideration. Plaintiff's appeal is directed only to the Commissioner's denial of a period of disability and disability insurance benefits. *See* (R. 148.)

remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 74.) The ALJ conducted Plaintiff's administrative hearing on February 14, 2006. (R. at 21-59.) The ALJ issued a decision unfavorable to Plaintiff on June 19, 2006. (R. at 11-20.) Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. at 5-9.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[3] Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[4]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[5] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[6] However, the

---

[3] *See* 42 U.S.C. § 405(g).

[4] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[5] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[6] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which (continued...)

district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[7]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[8] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[9]

The ALJ must follow five steps in evaluating a claim of disability.[10] First, if a claimant is working at a substantial gainful activity, she is not disabled.[11] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[12] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the

---

[6](...continued)
Commissioner relied).

[7] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[8] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[9] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[10] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[11] 20 C.F.R. § 404.1520(b).

[12] Id. § 404.1520(c).

Code of Federal Regulations, she is disabled.[13] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[14] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[13] Id. § 404.1520(d).

[14] 20 C.F.R. § 404.1520(e).

[15] Id. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[18] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

## III. SUMMARY OF THE EVIDENCE

Plaintiff was sixty three (63) years old at the time of the ALJ's decision on June 19, 2006. (R. at 11-20.) She has a high school education[24] and has taken some adult education classes at the local community college. (R.164, 122.) Plaintiff has previous work experience as a bookkeeper and secretary. (R.29, 34.) Plaintiff contends that she has been unable to work since October 14, 2001 primarily due to depression and

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[20] Walker, 826 F.2d at 1003.

[21] Wolfe, 86 F.3d at 1077-78.

[22] See id.

[23] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[24] (R. 29.)

various symptoms associated with diabetes. (R. 39-41, 52.) Plaintiff is insured for benefits through September 30, 2003. (R. 30, 103.)

In his review of the record, including Plaintiff's testimony, and medical records from several health care providers, the ALJ determined that Plaintiff has a severe combination of impairments including: diabetes mellitus, hypertension, hypothyroidism, and high cholesterol. (R.16.) However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations. (R.17.)

The ALJ then went on to find that Plaintiff retained the RFC to perform light work. (R. 17-18.) The ALJ limited Plaintiff to lifting and carrying ten pounds frequently and twenty pounds occasionally, standing and walking for up to six hours in an eight hour workday, and sitting for up to six hours in an eight hour workday, with normal breaks. The ALJ also found Plaintiff can occasionally climb, balance, stoop, kneel, crouch, and crawl, but should avoid extremes of cold and heat, working around hazardous machinery, and exposure to unprotected heights. (R.17.) The ALJ acknowledged Plaintiff's alleged depression, but determined that Plaintiff failed to show that she suffers any functional limitations as a result of depression. (R. 16-17.) After finding at step four of the sequential evaluation that Plaintiff could perform her past relevant work as a bookkeeper and/or secretary, the ALJ concluded that Plaintiff was not disabled.

Plaintiff, proceeding *pro se*, in her brief primarily concentrates on her depression and the various symptoms associated with diabetes mellitus. Accordingly, the Court will focus its discussion of the evidence to those two medical conditions.

### A.    Depression

During two telephone conversations with a Social Security Administration case manager,[25] Plaintiff advised that she was stressed and sad. (R.118-19.) However, Plaintiff was not seen by a mental health practitioner and Plaintiff denied taking any medication for depression.

Between May 2002 and February 2007, Plaintiff reported to examining physicians at least twice a year. Yet, none of Plaintiff's medical records document a diagnosis of depression or even document Plaintiff's subjective complaints consistent with depressed mood.

The only documentation of Plaintiff's mental status in the record appears in the report rendered in October 2004, by Dr. Nagy Shanawany, a physician who performed a consultative examination of Plaintiff at the request of the Social Security Administration. (R.180-84.) Plaintiff presented with complaints of diabetes mellitus, dyslipidemia, a thyroid problem, irritable bowel syndrome, pain in her lower extremities bilaterally, and periodontal disease. During his physical examination of Plaintiff, Dr. Shanawany described Plaintiff's mental status as: "alert and oriented . . . affect and mood tone are normal. Intellectual functioning appears normal." (R.180-84.)

---

[25] One of the conversations took place in October 2004, and the other occurred in April 2005. (R. 118-19.)

The only evidence submitted to the ALJ which mentions Plaintiff's subjective complaints of depression appears in a notarized letter from Plaintiff's husband, a letter from Plaintiff's previous employer,[26] and Plaintiff's self-reported symptoms[27] all of which generally suggest that stress exacerbates Plaintiff's diabetes symptoms.

## B.    Diabetes

Plaintiff was first diagnosed with adult onset type II non-insulin-dependent diabetes mellitus in October 2001. (R. 180.) Plaintiff presented to Community Health Services in May 2002 with complaints of a rash on her chest and abdomen. The physician diagnosed Plaintiff with candidal intertrigo[28]—a fungal skin infection—secondary to her diabetes. The doctor noted that Plaintiff's diabetes was diet controlled.  With regard to treatment of the skin infection, the doctor prescribed a medicated cream. (R.152-53.)

In July 2002, Plaintiff returned for a refill of the prescribed cream. Plaintiff complained that the rash had spread under her arms but advised that the rash under her breasts had responded to the medicated cream treatment. (R. 154.)

Plaintiff returned on January 3, 2003, complaining of difficulty controlling her blood sugar levels. She was diagnosed with uncontrolled non-insulin-dependent diabetes mellitus and instructed to get her blood sugar levels re-checked in 1-2 weeks.

---

[26] Plaintiff's daughter wrote a letter in her capacity as Plaintiff's previous employer. (R. 146.)

[27] Notably, however, none of Plaintiff's subjective complaints appear in any of the office notes from her treating practitioners.

[28] DORLAND'S MEDICAL DICTIONARY (2007).

The physician prescribed various medications to treat Plaintiff's diabetes symptoms. (R. 154.) Plaintiff subsequently returned on January 13, 2003, for blood work. The examining physician noted that, although the medication was causing some diarrhea, Plaintiff was doing much better. Plaintiff was instructed to continue on the medications at the same dosage. Plaintiff's blood test results revealed no significant abnormalities other than high cholesterol levels. (R. 155.) Plaintiff reported for a follow up visit on January 24, 2003 for further monitoring of her blood sugar levels. Plaintiff's physician observed she was "doing well with blood sugars" and recommended treatment of Plaintiff's high cholesterol via dietary changes. (R.155.)

Plaintiff presented to Dr. Rockower with a history of a thyroid problem and adult onset diabetes mellitus in July 2003. Plaintiff expressed her preference to try to control her diseases (and the corresponding symptoms) via natural remedies and dietary changes as opposed to taking prescription medication. (R.176.)

A month later, Plaintiff returned for a follow up visit with Dr. Rockower and he scheduled Plaintiff for extensive blood work. (R.178.) The blood testing revealed a raised glucose level of 153 mg/dL,[29] a high hemoglobin A1c level of 7.8 percent,[30] high cholesterol, and results supportive of hypothyroidism. (R. 179.)

In November 2003, Plaintiff was seen at Marion County Health Department—Adult Health Center for treatment of her diabetes. Plaintiff advised that

---

[29] According to the lab report, a "normal" glucose level falls within the range of 74-110 mg/dL.

[30] Hemoglobin A1c is a test which measures the level of an individual's blood sugar and is typically a "good estimate of how well diabetes is being managed over the last two or three months." AM. DIABETES ASS'N, STANDARDS OF MEDICAL CARE IN DIABETES (2007). An individual's diabetes is considered "poorly controlled" where the hemoglobin A1c level is above 7 percent. Id.

she discontinued taking her prescribed diabetes medication because it caused a dry cough. The physician listed Plaintiff's active problems as including: obesity, type II diabetes mellitus, a rash, and high cholesterol secondary to Plaintiff's diabetes. The physician noted that Plaintiff was taking over-the-counter medication to treat her diabetes. (R.158-59, 163, 166.)

Plaintiff reported for blood testing in January 2004 which revealed a high cholesterol level and a hemoglobin A1c level of 8.5 percent. (R. 162, 175.) Plaintiff was advised of the test results and prescribed Lipitor. Plaintiff declined the medication stating she wanted to try to lower her cholesterol on her own. (R. 162.)

In April 2004, Plaintiff presented with complaints of chest pain, light pressure in her chest, heart palpitations (controlled with aspirin), intermittent tingling in her arms and hands, and cramping in her legs. Plaintiff advised that the heart palpitations were controlled with aspirin. Physical examination of Plaintiff was normal except for a skin rash. Noting the Plaintiff was not compliant with her medications, the physician prescribed medication for treatment of Plaintiff's diabetes, hypothyroidism, and benign hypertension and instructed Plaintiff to return in three weeks for a recheck of her blood sugar levels. The physician also recommended an echocardiogram. (R. 161.) Blood testing revealed an improved, though still elevated, cholesterol level. (R.174.)

Plaintiff reported for a follow up visit in May 2004 with complaints that her rash had spread to her groin area. Accordingly, Plaintiff requested a refill of the medicated cream. Plaintiff was advised of reading material related to using diet to help control

diabetes symptoms. Blood testing revealed Plaintiff had a high glucose level of 150 mg/dL. (R. 168.)

As noted in Dr. Shanawany's report of October 2004, Plaintiff complained of a history of diabetes mellitus, dyslipidemia, a thyroid problem, irritable bowel syndrome, pain in her lower extremities, and periodontal disease. Plaintiff advised that she tried treatment of diabetes via medication, but was no longer taking any of the prescribed medications at the time of the examination. Physical examination revealed that Plaintiff was capable of walking without an assistive device and her gait was normal. Dr. Shanawany observed no deformity, redness, heat, swelling, or trophic changes in Plaintiff's extremities. Examination of Plaintiff's major joints and spine revealed no significant abnormalities. Neurological examination revealed no sensory or motor deficits and Plaintiff demonstrated no fine manipulative limitations or decreased grip strength. Dr. Shanawany's assessment was that Plaintiff suffered no complications due to her diabetes. (R. 180-84.)

In February 2005, Plaintiff saw Dr. Gene Zanetti, an optometrist, with complaints of blurred vision on daily basis. Plaintiff informed Dr. Zanetti that she took medication for diabetes, but was having "difficulty in controlling it." (R. 185.) Dr. Zanetti's impression was that Plaintiff's vision was impaired due to her fluctuating blood sugar levels and noted that Plaintiff experiences difficulty sustaining a visual task for long periods of time. On the day of her vision exam, Plaintiff's blood sugar registered at 246 mg/dL. Dr. Zanetti noted that he did not change the prescription for Plaintiff's glasses because he

believed her vision problems were the result of her uncontrolled blood sugar levels. (R. 185.)

Plaintiff reported to Express Care for a check up in October 2005 with complaints of occasional left sided chest pain. She was advised to go to the hospital to get a full cardiac work up. (R. 207.)

Plaintiff's husband submitted a notarized letter dated November 25, 2005, which included a statement that Plaintiff's blood sugar levels responded to her medications. (R. 150.)

A letter from Michael Crimi, Jr., P.A.C., a certified physician assistant at Express Care, dated February 22, 2006, confirmed that Plaintiff was a patient at Express Care and listed several medical conditions with which the Plaintiff had been diagnosed including diabetes mellitus, skin disease, cardiovascular disease, atypical chest pain, and hypertension.  (R.213.)  The letter confirms that the Plaintiff was instructed to have thyroid testing and a cardiac work up but that she had refused to do so because she did not have health insurance. Blood tests conducted in February 2006 revealed Plaintiff's glucose level was 236 mg/dL, her hemoglobin A1c was 12.1 percent, and her cholesterol levels were high. (R. 214-15.)

Plaintiff reported for cardiac testing in May 2006. A carotid ultrasound revealed no significant stenosis and mild intimal thickening. (R.230.) An echocardiogram showed trivial regurgitation in Plaintiff's mitral valve and left ventricle. (R. 231.)

12

In June 2006, Plaintiff's hemoglobin A1c level was at 9.7 percent. (R.  234.) Dr. Nasirul Huq noted in a letter dated July 5, 2006, that Plaintiff recently had started insulin therapy. (R.  239.)

Plaintiff returned to the Marion County Health Department for blood work in January 2007. The results revealed a hemoglobin A1c level of 9.6 percent, which suggests Plaintiff's diabetes was not under control. (R. 250.) A month later, follow up testing revealed a glucose level of 237 mg/dL and high cholesterol levels. (R. 248.)

At the request of the Social Security Administration, Dr. Donald Morford and Dr. Nicholas Bancks prepared Physical Residual Functional Capacity Assessments ("PRFC") of Plaintiff in 2005.[31] Dr. Morford reviewed Plaintiff's medical records and opined that Plaintiff was capable of lifting up to ten pounds frequently and up to twenty pounds occasionally, could stand or walk six hours in an eight hour work day and was unlimited in pushing and pulling activities. In making this assessment, Dr. Morford noted Plaintiff's refusal to undergo diagnostic testing and her noncompliance with her medications. According to Dr. Morford, Plaintiff's symptoms and complaints exceeded the objective findings and were at least partially attributable to Plaintiff's noncompliance with prescribed medical treatment. (R. 190-97.)

Dr. Bancks reviewed Plaintiff's medical records and determined that Plaintiff was able to lift twenty five pounds frequently and up to fifty pounds occasionally, could stand, walk, or sit about six hours in an eight hour work day, and was unlimited in

---

[31] Dr. Morford's PRFC was prepared on April 4, 2005. (R. 190-97.) Dr. Banck's PRFC is dated September 24, 2005. (R. 198-205.)

pushing and pulling activities. His assessment was based on his view that Plaintiff's

thyroid condition was trivial, her musculoskeletal examination was normal, and she

reported only one episode of atypical chest pain. (R. 198-205.)

## IV.  **DISCUSSION**

Plaintiff identifies two issues in her brief. First, Plaintiff suggests that the ALJ

erred by concluding that her diabetes mellitus and associated symptoms did not

constitute a severe impairment.[32] This argument lacks merit because the ALJ expressly

found that Plaintiff has a severe combination of impairments and subsequently

proceeded to step three of the sequential analysis and ultimately analyzed Plaintiff's

diabetes in evaluating Plaintiff's residual functional capacity ("RFC") at step four of the

sequential evaluation. (R. 16.)

Secondly, Plaintiff argues that the ALJ erred in failing to consider whether she is

capable of performing "other work" which exists in significant numbers in the national

economy. This argument also has no merit because Plaintiff misunderstands the

sequential evaluation the ALJ is required to use. The inquiry as to whether "other work"

exists in significant numbers in the national economy takes place at step five of the

sequential evaluation.  Because the ALJ properly concluded at step four that Plaintiff's

past relevant work as a bookkeeper and secretary—sedentary work—"does not require

the performance of work-related activities precluded by the [Plaintiff's] residual

functional capacity" of light work (R. 19) the ALJ was not required to continue to step

five of the sequential evaluation.  Accordingly, because the ALJ found that Plaintiff could

---

[32] In framing her argument, the Plaintiff mentions the durational requirement of step two of the sequential analysis as outlined in 20 C.F.R. §§ 404.1509, 416.909.

perform her past relevant work the burden never shifted to the Commissioner to show at step five that there was other work at Plaintiff's given exertional level that exists in significant numbers in the national economy.

Although these are the two main "issues" Plaintiff identifies in her brief, because the Plaintiff is a *pro se* litigant, the Court will liberally construe the discussion in Plaintiff's brief and attempt - as best as possible - to address the other comments in her brief which might implicitly raise other arguments.[33]

Plaintiff implicitly suggests that the ALJ failed to properly consider the combined effect of all of Plaintiff's impairments and subjective complaints.  Specifically, Plaintiff contends that the ALJ failed to assign any limitations to Plaintiff's claims of a depressed mood.  The ALJ did not err in evaluating Plaintiff's claims of a depressed mood and the ALJ's conclusion that Plaintiff was not functionally limited by her depressed mood is fully consistent with the evidence (or lack thereof).

At step two in the sequential analysis, the ALJ found that Plaintiff had a severe combination of impairments including: diabetes mellitus, hypertension, hypothyroidism, and high cholesterol. While the ALJ also acknowledged Plaintiff's claim that she suffered from depression, he ultimately concluded that Plaintiff's depressed mood was not a severe impairment. Although "the documents . . . submitted in support of [Plaintiff's] disability claim reflect frustration at the slowness of the system [and] . . .

---

[33] The Court carefully considered Plaintiff's brief in its entirety and concludes that, while she explicitly raises two issues, her objection to the ALJ's decision implicitly challenges the Commissioner's decision on additional grounds. *See, e.g.*, Johnson v. Astrue, No. 08-30110, 2008 WL 3911073, at *3 (5th Cir. Aug. 26, 2008) (noting that documents from *pro se* litigant in Social Security case should be construed liberally).

deep concerns about her health and the high cost of medical care," the ALJ noted the evidence was insufficient because there was nothing in the record to suggest Plaintiff's mental state caused her to suffer any functional limitations. The record fully supports this conclusion.

Most notably , Plaintiff was never diagnosed with depression. There is no evidence in the record that Plaintiff ever sought treatment from a mental health care provider and no evidence that she was ever prescribed medication to treat depression.[34] Over the course of nearly five years, none of the treatment notes from Plaintiff's annual medical examinations even mention Plaintiff's alleged depressed mood. Moreover, based on his October 28, 2004 consultative examination, Dr. Shanawany observed Plaintiff's mental status as being unremarkable.[35] Accordingly, the record fully supports the ALJ's finding that Plaintiff's depressed mood did not cause any functional limitation in her ability to engage in basic work related activities.

Plaintiff also complains that the ALJ failed to properly consider her subjective complaints and the accompanying lay evidence. Again, Plaintiff's argument is without merit. The law requires that where, as here, an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[36]

---

[34] *See* 20 C.F.R. § 404.1529(c)(3)(v); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

[35] (R. 183.) Specifically, he noted Plaintiff was "alert and oriented times three. Affect and mood [were] normal. Intellectual functioning appears normal." Id.

[36] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on

(continued...)

16

In support of her claim of disabling depression Plaintiff points to the letters she submitted and the letters her husband and daughter submitted. (R. 146, 150.)  The numerous letters written by Plaintiff, generally evidence Plaintiff's frustration with the Social Security Administration system and her concern regarding the stress caused by the prohibitive cost of her medical care. She also complains in the letters of a variety of symptoms including: crying spells, memory problems, confusion, mood swings, sleep disturbances, and feelings of hopelessness—all of which she attributes to her fluctuating blood sugar levels. (R. 144, 147, 256.)

The letter from Plaintiff's husband suggests that Plaintiff lacks energy, frequently has crying spells, and experiences a high level of stress. He also states that Plaintiff was "very likely [to] have a panic attack" in a work setting. According to Plaintiff's husband, all of these problems seem to be associated with her diabetes and not her depression. (R. 150.)

The same is generally the case with regard to the letter Plaintiff's daughter wrote on behalf of Plaintiff in her capacity as Plaintiff's former employer. All of the comments in her letter regarding Plaintiff's ability to work are related in some way to Plaintiff's diabetes or lack of requisite skills for the job—not depression. For example, Plaintiff's daughter states that Plaintiff was "concern[ed] about working [because] diabetes caused many symptoms including stress causing her blood sugar to rise." In addition, Plaintiff's daughter also states that Plaintiff experienced high levels of frustration and stress due

---

(...continued)
substantial evidence).

17

to her inability to learn how to use the computer programs necessary for her job. (R. 146.) However, Plaintiff's alleged frustration and stress associated with her inability to use computers effectively, is completely irrelevant to the ALJ's determination of Plaintiff's disability.[37] Although these letters document that Plaintiff's family believed her mood was depressed these letters do not constitute evidence from an "acceptable medical source" sufficient to establish the existence of a mental impairment.[38] In sum, while none of this evidence is acceptable medical documentation or support for Plaintiff's claims of disabling depression, the relevance of these letters, if any, relates to Plaintiff's symptoms associated with diabetes and not Plaintiff's claims of disabling depression. With regard to Plaintiff's symptoms associated with diabetes there is no question that the ALJ thoroughly discussed these symptoms and included them in his RFC evaluation.

In addition to complaining that the ALJ ignored her complaints, the Plaintiff also suggests that the ALJ failed to properly develop the record with regard to her depression and diabetes symptomatology. An ALJ has a basic obligation to fully and

---

[37] "Physical or mental impairment(s) must be the primary reason for the individual's inability to engage in a substantial gainful activity." SSR 82-53. A claimant's inability to work due to a reason other than a disability, *e.g.*, technological changes in the industry, does not constitute a disability. Id.

[38] *See* 20 C.F.R. § 404.1513(a), (d) (evidence of the existence of an impairment is a prerequisite to the Commissioner's duty to consider lay evidence in support of the severity of the alleged impairment); *see also* id. § 404.1508 ("A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms.").

fairly develop the record.[39] Because a hearing is non-adversarial in nature,[40] the duty to develop the record "is triggered 'when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'"[41] The Commissioner's duty to develop the record includes ordering a consultative examination if one is needed to make an informed decision.[42]

In this case there was no need to send the Plaintiff for a mental health consultative examination because there was no ambiguity or inadequacies in the record concerning Plaintiff's claims of disabling depression. As noted by the ALJ, there is a complete absence of any medical records that even mention Plaintiff's depressed mood, let alone offer a diagnosis for depression.  This conclusion is underscored by the fact that over the course of nearly five years of regular visits to various medical practitioners there is no mention in even one treatment note documenting Plaintiff's complaints of depressed mood.  Moreover, Dr. Shanawany, who performed a consultative examination noted that Plaintiff's mental status was essentially unremarkable. (R.183-84.)  Accordingly, the ALJ did not have a duty to send Plaintiff for a mental health examination and did not fail to develop the record on this issue.

Plaintiff also complains about the adequacy of the consultative examination and report by  Dr. Nagy Shanawany. According to Plaintiff, "the examination done on

---

[39] *See* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); *see also* Zaldivar v. Apfel, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[40] Id.

[41] *See* Mason v. Barnhart, 63 Fed. Appx. 284, 287 (9th Cir. 2003) (quoting Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)).

[42] *See* Reeves v. Heckler, 734 F.2d 519, 522 n.1 (11th Cir. 1984).

October 28, 2004 for the purpose of revealing evidence of disabilities was conducted in a non-professional, incompetent, inaccurate way." (Doc. 13, p. 5.) Plaintiff questions the qualifications of Dr. Shanawany to examine her with regard to diabetes. Further, Plaintiff complains that the examination was inadequate because no blood or urine testing was done to assess the severity of her diabetes; no x-rays were taken to assess her complaints of cervical and lumbar pain; she was not permitted to read from her notes in response to Dr. Shanawany's questions about her symptoms; and Dr. Shanawany failed to fully examine her skin rash and the lumps under her arms. (Doc. 13.) Plaintiff therefore concludes that the resulting report was inaccurate.[43]

Dr. Shanawany, a licensed medical doctor, conducted a thorough medical evaluation of Plaintiff upon referral form the Office of Disability Determinations. After examining the Plaintiff, Dr. Shanawany opined that Plaintiff did not suffer any complications from diabetes noting that she was non-compliant with her prescribed medications. He noted that Plaintiff's gait was normal and that she was able to walk without an assistive device. Dr. Shanawany noted that Plaintiff was able to hear and understand normal conversational speech and her communication skills were largely normal. Notably, upon examination, Dr. Shanawany did not detect any motor deficits in Plaintiff's extremities nor any restricted range of motion, deformity, swelling, or other abnormalities in her major joints. Plaintiff's grip strength and fine manipulation abilities were normal. In his examination of Plaintiff, Dr. Shanawany found that Plaintiff was alert

---

[43] Plaintiff complained that the report omitted many of her complaints because Dr. Shanawany refused to let her read from her notes. She also argued that Dr. Shanawany's report is factually incorrect because it stated that her gait and station were "normal" despite Plaintiff's claim that she almost fell over during the physical examination. (R. at 46-47.)

and oriented, her affect and mood tone were normal, and her mental status was essentially unremarkable. (R. 183-84.)

Dr. Morford reviewed Plaintiff's medical records (including the report prepared by Dr. Shanawany) and prepared a functional assessment of Plaintiff. He concluded that Plaintiff's symptoms and complaints were unsupported by objective medical findings and were at least partially attributable to Plaintiff's noncompliance with her medications and prescribed medical treatment.[44]

While Dr. Shanawany might not have been a specialist in diabetes, that does not mean he was incompetent to conduct a consultative examination of an individual who had diabetes. Indeed, there was no need for Dr. Shanawany to send Plaintiff for blood work and urine testing because Dr. Shanawany had been provided with and was able to review a longitudinal history of the results of Plaintiff's blood work and urine testing.[45] Thus, as part of the diagnostic impression, Dr. Shanawany found that Plaintiff indeed suffered from diabetes mellitus but that she simply did not have any complications due to diabetes.

In addition, Dr. Shanawany properly assessed Plaintiff's complaints of cervical and lumbar pain without the benefit of x-ray results because he did not observe any abnormal clinical findings during his examination of Plaintiff's musculoskeletal system, which would have suggested that he obtain x-rays. Finally, the fact that Dr. Shanawany

---

[44] (R. 190-97.) Dr. Morford noted that Plaintiff refused testing and referral treatment. Id.

[45] 20 C.F.R. § 404.1519p(b) ("The facts in a particular case and the information and findings already reported in the medical and other evidence of record will dictate the extent of detail needed in the consultative examination report.").

might not have included in his report every detail of Plaintiff's alleged complaints during the examination, does not effect the reliability of the report. A report is compliant with Social Security guidelines so long as the report is internally consistent, and does not contradict findings in Plaintiff's medical history without explanation.[46] Dr. Shanawany's assessment that Plaintiff suffers no complications from diabetes is fully supported by the medical evidence in the record which documented that Plaintiff's diabetes symptoms were largely due to fluctuating blood sugar levels and that Plaintiff's blood sugar levels responded well to medication and therefore could be controlled.

Plaintiff also suggests that the ALJ erred by failing to defer to the diagnoses rendered by "Dr." Michael Crimi, who Plaintiff characterizes as her "treating physician."[47] The problem with Plaintiff's argument is that Michael Crimi is a certified physician's assistant and not a medical doctor. While medical information from a physician's assistant is considered evidence the opinion of a physician's assistant is not an "acceptable medical source" under the Social Security Regulations which can be used to establish the existence of an impairment.[48]

Further, even if Mr. Crimi's report was entitled to controlling weight (which it is not), the report merely provides a diagnosis and not an opinion of functional limitations or restrictions caused by a medical impairment. In order for a medical report to be given controlling weight it must be  well-supported by medically acceptable clinical and

---

[46] *See* 20 C.F.R. § 404.1519p(a).

[47] Dr. Crimi is a certified physicians' assistant.  Social Security Regulations provide that a physicians' assistant is not an "acceptable medical source" under § 404.1513(a). Instead, physicians' assistants fall under the category "other sources" as outlined in § 404.1513(d).

[48] 20 C.F.R. § 404.1513(a).

laboratory diagnostic techniques, and must not be inconsistent with the other substantial evidence in the record.[49]  Conclusory statements are entitled to only such weight as can be supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[50] Mr. Crimi's report is not supported by clinical and laboratory findings and indeed is inconsistent with the other acceptable medical source evidence of record.[51] Thus, the ALJ offered good reasons for his statement that he gave less weight to Mr. Crimi's conclusory statements that Plaintiff suffered from degenerative joint disease of the cervical and lumbar spine and cardiovascular disease because such diagnoses were unsupported by objective medical evidence.

Finally - without any support other than her self reported complaints - Plaintiff contends that her various medical impairments render her incapable of even sedentary work. This argument, like the others, has no support in the record and is without merit. The ALJ thoroughly evaluated Plaintiff's symptoms to determine what, if any, functional limitations resulted from them. Based upon the functional limitations the ALJ found were caused by Plaintiff's impairments, the ALJ properly concluded that Plaintiff was limited to lifting and carrying ten pounds frequently and twenty pounds occasionally, standing and walking for up to six hours in an eight hour workday, and sitting for up to six hours in an eight hour workday, with normal breaks. The ALJ also found Plaintiff occasionally

---

[49] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008); see also 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence).

[50] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

[51] Mr. Crimi's report is inconsistent with the results of Dr. Shanawany's findings which noted that on examination Plaintiff had a normal range of motion and was negative for motor deficits, muscle spasms, tenderness or swelling in her cervical and lumbar spine and that Plaintiff's cardiovascular system was unremarkable. (R. 182, 183.)

can climb, balance, stoop, kneel, crouch, and crawl, but should avoid extremes of cold and heat, working around hazardous machinery, and exposure to unprotected heights. (R.17.) The ALJ's assessment of the functional limitations associated with Plaintiff's various medical impairments took into consideration the fact that Plaintiff's diabetes would cause her to have a reduced energy level and he adjusted her RFC accordingly. (R. 18.) And the ALJ's RFC evaluation also appropriately took into account the evidence in the record that Plaintiff was noncompliant with prescribed medical treatment and that Plaintiff's fluctuating blood sugar levels  - and related symptoms (*e.g.*, blurry vision) - were related to Plaintiff's failure to take her prescribed medications.[52]

Accordingly, the Court concludes that substantial evidence supports the ALJ's decision that Plaintiff was not disabled and Plaintiff has failed to offer any reasons to suggest that the ALJ erred in his decision.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on September 18, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:

The Honorable Wm. Terrell Hodges
Senior United States District Judge

Counsel of Record
*Pro Se* Plaintiff

---

[52] While Plaintiff points out that she began insulin therapy treatment in June 2006, after the hearing, this was three years after he date last insured. Further, Plaintiff does not suggest how her use of insulin therapy impacts her functional ability to do light work.